## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IRVIN HAWKINS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-1558** |
| **WARDEN** | **SECTION: "J"(1)** |

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.   Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.   See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Irvin Hawkins, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On August 25, 2005, he was convicted of forcible rape and aggravated crime against nature under Louisiana law.[1]  On March 21, 2006, he was sentenced on the forcible rape conviction to a term forty years imprisonment and on the aggravated crime against nature conviction to a consecutive term of fifteen years imprisonment.[2]  On September 25, 2007, the

---

[1] State Rec., Vol. 13 of 14, transcript of August 25, 2005, pp. 16-17; State Rec., Vol. 3 of 14, minute entry dated August 25, 2005; State Rec., Vol. 3 of 14, jury verdict form.

[2] State Rec., Vol. 13 of 14, transcript of March 21, 2006; State Rec., Vol. 3 of 14, minute entry dated March 21, 2006.

Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences.[3]  The Louisiana Supreme Court then denied his related writ application on April 18, 2008.[4]

On or about May 24, 2008, petitioner filed an application for post-conviction relief with the state district court.[5]  That application was denied on June 17, 2008.[6]  He did not seek review of that denial.

On July 24, 2008, petitioner filed a federal application for habeas corpus relief; however, that application was dismissed without prejudice on March 17, 2009, because he had not exhausted his remedies in the state courts.[7]

On or after February 7, 2016, petitioner filed with this Court a deficient federal application for habeas corpus relief,[8] which he then later supplemented on two occasions.[9]  The state has filed a response arguing that petitioner's application is untimely.[10]  The state is correct.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."  28 U.S.C. § 2244(d)(1)(A).[11]  On that point, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes

---

[3] State v. Hawkins, 968 So.2d 1082 (La. App. 5th Cir. 2007); State Rec., Vol. 4 of 14.
[4] State v. Hawkins, 978 So.2d 347 (La. 2008); State Rec., Vol. 4 of 14.
[5] State Rec., Vol. 4 of 14.
[6] State Rec., Vol. 4 of 14, Order dated June 17, 2008.
[7] Hawkins v. Connick, Civ. Action No. 08-4142, 2009 WL 701719 (E.D. La. Mar. 17, 2009).
[8] Rec. Doc. 1.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Because petitioner dated his application on February 7, 2016, it obviously was given to prison officials for mailing on or after that date.
[9] Rec. Docs. 3 and 12.
[10] Rec. Doc. 10.
[11] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

2

final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

Here, the Louisiana Supreme Court denied petitioner's direct-review writ application on April 18, 2008.[12]  Accordingly, his state criminal judgment became final for AEDPA purposes, and his federal limitations period therefore commenced, ninety days later on July 17, 2008.  His limitations period then expired one year later on July 17, 2009, unless that deadline was extended through tolling.

The Court first considers statutory tolling.  Regarding the statute of limitations, the AEDPA expressly provides:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).  However, petitioner had no such applications pending before the state courts during the applicable one-year period.[13]  Accordingly, he clearly is not entitled to statutory tolling.

The Court must next consider *equitable* tolling.  The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling.  Holland v. Florida, 560 U.S. 631, 645 (2010).  However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary

---

[12] State v. Hawkins, 978 So.2d 347 (La. 2008); State Rec., Vol. 4 of 14.

[13] Although petitioner filed an application for post-conviction relief with the state district court on or about May 24, 2008, that application was denied on June 17, 2008.  Because it was no longer pending after the date petitioner's state criminal judgment became final for AEDPA purposes, that filing obviously did not toll petitioner's federal limitations under 28 U.S.C. § 2244(d)(2).

Further, although petitioner's first federal application was pending during this one-year period, that filing is of no moment here.  A *federal* application for habeas corpus review is not an "application for State post-conviction or other collateral review" and therefore does not trigger the tolling provisions § 2244(d)(2).  Duncan v. Walker, 533 U.S. 167 (2001); Mathis v. Thaler, 616 F.3d 461, 473 (5th Cir. 2010); *In re* Wilson, 442 F.3d 872, 876 n.5 (5th Cir. 2006); Mercadel v. Cain, 84 Fed. App'x 456, 457 (5th Cir. 2004).

circumstance stood in his way and prevented timely filing."  Id. at 649 (internal quotation marks omitted); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances").  A petitioner bears the burden of proof to establish entitlement to equitable tolling.  Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).  In the instant case, petitioner has brought forth no evidence demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

Lastly, the Court also notes that the United States Supreme Court has held:  "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013).  Petitioner does not invoke McQuiggin. However, in the event he does so in any objections to this Report and Recommendation, the undersigned finds that petitioner has not made the showing required under McQuiggin for the following reasons.

In McQuiggin, the Supreme Court expressly cautioned:  "[T]enable actual-innocence gateway pleas are rare:  '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  McQuiggin, 133 S. Ct. at 1928 (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).  Further, as the United States Sixth Circuit Court of Appeals has explained:

> To assess that question, a court must survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."  House v. Bell, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (internal quotation marks omitted).  With "all the evidence" thus in mind, the court's final task is "to assess the likely impact of the evidence on reasonable jurors"; it is not to work through an

"independent factual determination" to divine "what likely occurred." Id. (internal quotation marks omitted).

Eberle v. Warden, Mansfield Correctional Institution, 532 Fed. App'x 605, 613 (6th Cir. 2013); accord Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *2-3 (E.D. La. July 27, 2015), aff'd, 2016 WL 3667577 (5th Cir. July 7, 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014).

A logical starting point, therefore, is to look at the "old" evidence, i.e. the evidence presented at trial and on which petitioner's convictions were based. See, e.g., Johnson, 2015 WL 4528889, at *3; Lyles, 2014 WL 4674673, at *6. Here, that evidence was recounted in the Louisiana Fifth Circuit Court of Appeal's summary of the facts of this case on direct appeal:

> At trial, LL[FN1], the victim, testified that on September 8, 1997 she was sexually assaulted by her uncle, the defendant herein. LL was 18 years old at the time of the assault. She explained that at the time she was living with her grandmother and the defendant stayed at that residence on occasion. LL described the events of that night as follows: She was halfway asleep, when she heard her bedroom door close. She rolled over in bed to see the defendant standing behind her next to the wall. She asked the defendant, "What are you doing in here?" In response, the defendant grabbed her by her shoulders and pulled her off her bed onto the floor. When she was on her stomach, face down on the floor, the defendant sat on her. LL testified that while she was in this position, the defendant put something in her mouth "like a towel or something, wrapping it around [her] mouth," so she could not speak. While she could not identify the object the defendant tried to put in her mouth, the victim testified that the tied socks, later found in her room by the police, did not belong to her and were not in her room before the assault. The defendant tried to tie her hands behind her back as he took off her underwear and shorts. When she tried to get up, the defendant told her, "[i]f you don't stop or stay still, I'm going to stick it in." LL explained that she continued to fight and to try to get away from the defendant, as they tussled around the floor. When she was able to get the binding off her mouth, she began to yell and scream and tell him to stop. In response, the defendant put his hands over her mouth and then around her throat, as he "proceeded to squeeze [her] throat so [she] would stop screaming." She stopped screaming and yelling, when he strangled her. Then, the defendant moved her to the foot of her bed where he held her hands down and her legs open. While on top of her, he licked her vagina, as he said, "Oh, L." She started crying, screaming, and telling him to stop again. In response, the defendant again put his hands around her throat to stop her from screaming by choking her. Then, the defendant started to lick her vaginal area again and "feel[ ] on [her]

breasts." She continued to fight the defendant, hitting him with objects within her reach, including a radio speaker and a Sega Genesis game. She testified that at one point she unsuccessfully tried to wrap an electrical cord around his neck. LL testified that at this point, the defendant masturbated, "playing with his penis with one hand," as he sat on top of her. After the defendant achieved an erection, he rubbed his penis against her vaginal area. She testified she felt the defendant gliding his penis through her vaginal area and "it felt like he was trying to put [his penis] inside of me." She agreed that the defendant had gone underneath or slightly inside her vagina. LL explained that she put her hand "down there" because she did not want the defendant to "put [his penis] in." LL testified that she began to pray and then the defendant got up, wiped her off with her own shirt, and then he went to the bathroom.

>[FN1]  In accordance with LSA-R.S. 46:1844(W)(3), the victim of this sex offense will be referred to by her initials to protect her identity. State v. Berniard, 03-484, p. 11 (La.App. 5 Cir. 10/15/03), 860 So.2d 66, 78, writ denied, 03-3210 (La. 3/26/04), 871 So.2d 345.

LL testified that no one else was at the residence at the time of the attack. After defendant went into the bathroom, she called her mother on the telephone and told her, "Uncle Mack just raped me" referring to the defendant. LL testified that she called her boyfriend's mother who told her that they were on their way. LL testified at this point, the defendant called her name, and said, "It tastes good" and "You feel good." At that point, LL turned on the lights, put on the same shorts that she wore before she was assaulted, and proceeded to the front door. When she made it to the front door, the defendant pulled her away to prevent her from opening the door. She ran to the garage to try to get out of the house through the garage door. As she pulled on the metal rod that kept the garage door down, the defendant grabbed her from behind. She tried to hold onto the metal rod in the garage door, but the defendant was pulling her away, as he said, "What's wrong with you? What are you doing?" LL testified that she was able to escape and run to the front door again. She opened the front door and the gate, and then ran outside.

LL testified that she was running toward her boyfriend's house, when she collapsed on the next street. Her boyfriend and his parents saw her, picked her up, and brought her to her boyfriend's house where her mother was waiting, and police were called. She was given another pair of shorts to wear. The victim testified that she sustained bruises around her neck and to her legs, and cuts to both the inside and the outside of her mouth and her legs from fighting the defendant. She was taken to the hospital where a sexual assault examination was performed, and she was given medication. After the examination, she spoke to Sergeant Monie and gave him a taped statement.

Sergeant Darren Monie, of the Jefferson Parish Sheriff's Office, testified that on the date of the offense he was assigned to the Sex Crimes Unit. He was called to investigate an aggravated rape complaint. When he arrived at the residence, LL identified the defendant, her 41 year-old uncle, as the person who

sexually assaulted her.  He described LL as calm and withdrawn, which he opined in his experience was typical for a victim of sexual assault.  Sergeant Monie observed minor cuts to the victim's lips and inside of her upper and lower gums, as well as scratches or lacerations to her neck and scratches on her left knee.  The victim also complained that she had neck pains.  Sergeant Monie testified that the victim's reported injuries were consistent with her report of the rape.  He collected the shirt worn by the victim during the assault and the blue shorts that she wore after the assault.

After interviewing the victim, Sergeant Monie relocated the investigation to the victim's residence.  After receiving a consent to search the home, the police entered the home and immediately found the defendant who was placed under arrest.  Sergeant Monie testified that he did not see any scratches or bruises on the defendant.  Among the articles of clothing worn by the defendant, there was a purple T-shirt that was taken into evidence.  Sergeant Monie also collected one Affinity diamond quartz wristwatch with a broken band, photographs of the interior and exterior of the residence, and one pair of purple socks tied at the toes found under LL's bed.  According to Sergeant Monie, the knotted area on the purple socks was still moist.  He opined that, consistent with the victim's account of the sexual assault, the moistness was caused by the victim's saliva when the knotted socks were used to gag her.  Photographs were taken of items the victim used to defend herself, namely a boom box and its speaker, and a Sega Genesis Playstation.  These items were all found on the floor of the victim's bedroom.  Photographs were also taken of the panties worn by the victim at the time of the assault that were found on her bed, her watch found on the television, and the garage door.

Sergeant Monie obtained an audiotaped statement from the victim after her sexual assault examination.  He also collected a pair of yellow shorts worn by the victim to her sexual assault examination.  Sergeant Monie attempted to interview the defendant, but the defendant refused to sign the arrestee rights form or give a statement.

Dr. Steven Cohen, an expert in obstetrics and gynecology, testified that he performed the sexual assault examination on LL, on September 9, 1997.  Dr. Cohen explained that he wrote a report stating that the victim reported that she was "[a]sleep in bed.  Husband put mouth on vagina.  Licked breast.  Tried to strangle her several times."  Dr. Cohen observed and noted that the victim was moderately upset, her neck and mouth were swollen and slightly reddened, and she had a small scratch to her left knee.  Dr. Cohen testified that there was no evidence of trauma during the pelvic examination.  He explained that in rape cases there was often a lack of physical evidence to the vagina even when there is penetration because the amount of trauma is dependent on the victim's prior sexual experience.  Dr. Cohen agreed that the wetness or moistness of the vagina could also affect whether there were any physical signs of abrasion or forced penetration.  On his report, he circled "No," in response to questions regarding the penetration of the victim's vulva, mouth, and anus.  He testified that there was no sperm or semen found in fluid taken from the victim's cervix and vagina, which he opined was also common.  However, Dr. Cohen agreed that the perpetrator's "wiping off" the victim after a slight penetration could affect the presence of semen in the victim's vagina.

The State and the defense entered into a stipulation concerning a portion of a report written by Julie Golden, an expert in the field of forensic science.  That portion of the report concerned a cutting taken from "the new River Blue shorts" worn by the victim.  The stipulation was read into the record. It stated,

> 'DNA test results from the sperm cell fraction of the cutting from the shorts, New River brand, are consistent with a mixture of the reference blood stain sample of the suspect, Irvin Hawkins, and at least one other unknown DNA donor.  Therefore, Irvin Hawkins is not excluded as a sperm cell donor in ReliaGene Sample 999904.'
>
> And a supplement conclusion is that, '99.5 percent of the population is excluded as a possible donor to the genetic profile generated from the cutting of shorts, New River brand.'[14]

The foregoing "old evidence" evidence was obviously compelling evidence of guilt, and so petitioner would face a daunting burden to present a credible "actual innocence" claim.  Specifically, the United States Supreme Court has explained:  "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- *whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence* -- that was not presented at trial.  Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful."  Schlup v. Delo, 513 U.S. 298, 324 (1995) (emphasis added).  Here, petitioner presents no new evidence whatsoever, much less any evidence of the type or caliber referenced in Schlup.  Therefore, he has not met "the threshold requirement" for McQuiggin to apply, i.e. a showing that "in light of the *new* evidence, *no* juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  McQuiggin, 133 S. Ct. at 1928 (quoting Schlup, 513 U.S. at 329; emphasis added).  Accordingly, McQuiggin does not aid him.

Because petitioner is not entitled to statutory tolling, and because he has not established that he is eligible for equitable tolling or that the McQuiggin "actual innocence" exception applies,

---

[14] State v. Hawkins, 968 So.2d 1082, 1084-87 (La. App. 5th Cir. 2007); State Rec., Vol. 4 of 14.

his federal application for habeas corpus relief had to be filed no later than July 17, 2009, in order to be timely.  His application was not filed until on or after February 7, 2016, and, therefore, it is untimely.

## RECOMMENDATION

It is therefore **RECOMMENDED** federal application for habeas corpus relief filed by Irvin Hawkins be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[15]

New Orleans, Louisiana, this nineteenth day of August, 2016.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[15] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.